Good morning, your honors. John Bogart from Tucson, Arizona, District of Arizona. Before us this morning we have two issues. One is the introduction of bad act evidence and second is the district court award of a two-point obstruction of justice under the federal sentencing guidelines under USSG 3C 1.1. I'd like to first discuss, if I may, the bad act evidence. The first initial consideration for the court would be whether or not this bad act evidence, which was introduced by the government, which had to do with the theft or alleged theft of monies from the U.S. Postal Service approximately three years prior to the offense's charge, would be 404B material under federal rules of evidence or whether it was, in fact, rebuttal evidence. The standards of review are somewhat the same. It's abuse of discretion. With respect to whether it's 404B evidence or rebuttal evidence, I'd ask the court to consider the comments of the district court under the reporter's transcript of August 12, 2002, page 24, lines 11 through 25, in which the district court indicated that it believed that the evidence that was introduced is characterized by the appellant as 404B material but by the government as rebuttal evidence was too remote in time and not similar enough to be 404B. So then we come to the second consideration is whether or not it is rebuttal evidence. Well, counsel, didn't the district court make it fairly clear that if your client was going to claim that he was being targeted for investigation because of some mysterious, irrational or conspiratorial reason that the government would be free to say, no, we targeted you because you'd stolen before. And the court, to me, seemed to make that quite clear. So what's wrong with that theory? And didn't you, in fact, open the door to that evidence? I was going to come to that right now, and it's a very good question, Your Honor. The question is who opened the door. And I believe that is a factual consideration. And under the standards, under United States v. Chrisman, any statements must be taken most favorable towards the defendant. Counsel, I'm sorry, go ahead. Well, I was just looking for the particular part in the transcript. During the hearing, immediately when that evidence was introduced, didn't, I believe it was you, didn't you concede that you had opened the door? I did, Your Honor. Thanks. Your Honor, I admit that I did. I was a trial counsel in that. And I can say under the heat of the battle, I did so. But at the same time, I don't think it's fair at this point to bind my client to that, because the real issue comes down to whether my cross-examination of Agent Dent, which would be found in the transcript of April 9-02, pages 35, line 9, through page 38, line 12, in fact opened the door. But, counsel, when you tell the court, yes, I concede I opened the door, and then he goes and the court goes on and lets the other side of the door come in, how could we find that's error? Well, I was put in a position in which no matter what I did in trial, and I say as defense counsel, that evidence was going to come in. It either was going to come in as 404-B material if my client testified, or if I put on any witnesses as character witnesses, it was going to come in, because the government prior to trial, the day of trial, but actually filed the motion the day before, asked to put that evidence in for character witnesses were there for on behalf of my client. So I was put in a box, and I have to say that was very good legal maneuvering by the government, no question about that, but at the same time, it comes down to whether or not this evidence was sufficiently probative as opposed to prejudicial, and whether or not it in fact went to a conspiracy. Well, counsel, that actually seems like a fairly common problem for defense counsel to have a client with a difficult past, and maybe the choice is simply to let the government put on its proof as to the current crime and hope that you can poke enough holes in that, but I don't see why it's not probative of, for one thing, his intention to steal on this occasion, if you're looking at the 404-B criteria. Well then, if I could respond here, I'm sorry, I didn't mean to cut off, Your Honor, then you have to look at the criteria for a 404-B, which would be prior material, prove a material element similar to the crime charge, sufficient evidence of the bad act, and not too remote, and even the district court found that it was too remote and it wasn't similar, so it couldn't really come under 404-B, according to the district court. Bottom line is, it was, and I respectfully submit this, more prejudicial than probative to the offense for which he was charged here. We're talking three years later. One was alleged theft of monies from the U.S. Postal Service three years earlier, and the second was whether or not he actually stole a package as a postal worker. But you had this defense that it was a conspiracy to set him up by the government, and it was, this evidence was probative of that, no, there wasn't this unfair conspiracy to set him up because he, they weren't just picking on him or singling him out or seeking to entrap him in some way. He had been under prior investigation. And, Your Honor, that's correct. My cross-examination of Postal Inspector Dent went to whether or not he, there have been allegations of stolen packages a year earlier. My client at that time was in off-duty status because of the difficulties he had then, and I was bringing out only that although they had packages stolen, it could not have been my client. The issue then comes down to did that open the door, or if it didn't open the door for conspiracy and set-up, the first indication of any alleged conspiracy, the first time conspiracy actually came into being was the direct examination by the government of their witnesses-in-chief, which would be Dent and Shoup and a number of other witnesses, because every one of them asked, were you involved in a conspiracy? Were you involved in a set-up? The set-up was even brought in first by their own witnesses. So we didn't put this in, but once we got to the point where this is in evidence in the government's case-in-chief, at that point we had to have some kind of response. Because the issue of a conspiracy in the set-up was already put into the record. If the Court has no further questions on this, I would like to briefly touch upon the second point, one, enhancement for two points, taking the statements evaluated. In this particular case, the government argued for two points and received it. The enhancement does have some significance because it makes a difference whether or not the defendant is sentenced under Zone A or Zone B of the sentencing guidelines. The real issue is the government didn't believe, the Court didn't believe, and the jury didn't believe the defendant's story. The defendant said this package was opened. They just didn't believe it. But I believe there was not sufficient evidence, even by a preponderance of the evidence, which is a standard, to show that he was lying. He was telling his story the way he thought that it occurred, and I think it was improper for the Court, I believe, to do this. Your client didn't get the full measure of the sentence to which the Court could have given him. Isn't that correct? The Court added two points. That's correct. But you didn't, your client, in fact, didn't get sentenced within the range that the Court said he was eligible for. He got sentenced to a much lesser period. So what are the collateral consequences? What are the consequences to your client of having gotten the benefit of the district court's largesse in this case? Well, in, with the two points, the Court was required to go under Zone B, which means he had to have, and combined with home confinement or community correction center, if it had been a Zone A with those two points off, the Court would not have been bound to do that. I can't say the Court would have done that, but the Court was required by law to do that. So there were collateral effects to it. Counsel, if we find that the Court has erred there, what's the appropriate remedy for us to do is to send it back to the district court and let the district court have a different, have another run at this, in which case it might offer a more fulfillment explanation and sentence your client to additional time in jail? Well, I don't believe that the Court at this time could sentence him to additional time. I think he could stay with the same sentence or could re-evaluate and say no. Well, if the district court came out and said on remand, well, okay, let me, if I didn't give you a sufficient explanation for a two-point addition, let me do it now. And since I'm now, your client's now eligible for then what, was it nine to 12 months under the additional two points or six to 12? Six to 10, Your Honor. And then give him 10 months instead of the two months he got. Your Honor, I don't believe that the Court can do that at this point. I believe it would have to stay within the same sentence or reduce it. Although, in all due respect to the Court, he's already served a sentence and is now presently unsupervised. Does that make this second point moot or are there any potential consequences to the extent of his supervised release or any other practical consequences whatsoever if we agreed with you on the obstruction argument? I believe it would make it moot for this client, but it might make it different for other criminal defendants if they come under the same circumstance. Before you say that, let me just ask, if he were to prevail on this, would there be the real possibility that on remand the district court might decide to impose two years' supervised release rather than three years? Is that a possibility? I believe it is a possibility. I mean, so wouldn't the Verden case apply to that? It's not – I mean, since I wrote the Verden case. Excuse me, Your Honor. I'm having a little trouble hearing you. The way I read the Verden case is if there's a real possibility that upon remand his sentence could be altered in any other way, if you were to prevail, your argument is not moot. Well, I would argue for a lesser sentence, but in terms of – in practicality, I know the judge and I also know what he said in sentencing, and frankly, I'd have to say if we went back, he'd probably sentence the same thing, and that's being fair and honest with the court. Yeah, well. But I think legally he would have the authority to do that. That's the real question, is legally, not whether or not you – in assessing the judge's personality characteristics. No, I understand. But I believe legally he would have that option, Your Honor. Okay. Thank you. Thank you. Thank you, counsel. We'll hear from the government now. Good morning, Your Honor. Jane Westby on behalf of the United States, the appellee in this case. Your Honor, this was a case where the defendant was literally caught red-handed with a decoy package that was rifled through. The shrink wrap was gone. The label was gone after hearing – when the inspectors heard a toilet flush. To make things worse, the defendant lied about it. He said, oh, the package is mine. My brother gave it to me. He's found with eight cell phones that should never have been at that Mariposa Box Unit after complaints of missing parcels, but not just any missing parcel, complaints of missing cell phones. And that was the government's case. The defendant injected into this trial a conspiracy theory. And this had been this defendant's theme. And he was actually cross-examined on this, that in the two prior removal hearings, he had said it was a setup. The government knew where the defense was going with this. And in fact, Mr. Bogart talked about it in his opening statement in the reporter's transcript of 4-9-2002 at page 5. Mr. Bogart stated, I believe clearly that Mr. Bouvian was set up. That's the first time those words come in. Then he cross-examines Inspector Dent. And when he does that, he brings out that his client's been investigated by the Financial Investigations Unit. And I believe these are pages, let's see, 22 to 25 in the supplemental excerpt of record. That he's being investigated by the Financial Investigations Unit. That it was an active investigation. That he's been connected with missing parcels. And even more concerning, that he was reinstated after the investigation, inferring that the investigation was somehow illegitimate. The defendant testifies to that, too, that he was reinstated. Mr. Urea testifies to that for the defendant, that he was reinstated. So continually through this trial, the defendant is interjecting that, yes, he was investigated, but he was reinstated, obviously meaning that the investigation was illegitimate. That's why the government was granted leave to bring in, not as 404B evidence to prove motive intent, but as rebuttal evidence to discount the conspiracy theory. To say there was a legitimate reason that the Postal Service was investigating him. And one of the things the inspectors didn't know was that Julie Feroz, who testified, had actually done an audit prior to the time that the 1091 cards that the inspectors needed with regard to that past financial investigation. Those 1091 cards had been altered in some manner, and the jury heard about that as well. And so Julie Feroz was able to come in for the government and testify that before those cards were altered, she'd worked with this guy for 20 years, she recognized his handwriting, and he took approximately $13,000 of post box rent receipts by her calculation. And the other thing that I want to stress here today, which is the crux of the whole matter, is that this was a trial tactic by defense counsel. As I stated, he mentioned it in the opening statement, and he then opened the door on the cross-examination of Inspector Dent. And if you look at SCR 35, defense counsel says, I believe I did open the door. I have no question about that. I have no question about that. Today he says that that was in the heat of battle. But if you take a look at supplemental excerpt of Record 143, months later he's at the trial tactic, that he knew the defendant was going to testify, and that's why he drew the sting first, which is completely consistent with him talking about it in opening statement, and of course completely consistent with his cross-examination of Inspector Dent. And then if you also look at the defendant's excerpt of Record at page 60, Judge Zapata, and this is right before the rebuttal evidence comes in during trial, Judge Zapata is essentially saying, well, and I'm paraphrasing, you know, gee, Mr. Bogart, you've injected this conspiracy theory. The government's entitled to rebut that now. What did Mr. Bogart say? He says, I don't disagree with you, Judge. I don't disagree with you. The issue here is redundancy. Not whether the rebuttal evidence comes in, but if you put on Julie Feroz, either let the government put on Feroz or Scholl, because otherwise it's going to be redundant. So it cannot object to the rebuttal evidence, but rather that it's redundant in this case. So two times the defense counsel conceded, and one time clearly on the record that he had no objection to the rebuttal evidence coming into this case. Even if somehow, and I disagree that it was error in any manner, this defendant injected so much prejudice into this trial himself that it's clearly harmless error. The defendant testified that Mr. Urea, his witness, thought he was a complete liar. The defense counsel on the cross-examination of Ms. Shoup, and this is on the reporter's transcript, April 11, 2002. I apologize that I got it wrong in the supplemental excerpt of record, but the pages from April 11, 2002 are 147 to 156. Defense counsel on cross-examination of Ms. Shoup brought out a whole nother 404B Act that the government never intended to offer, knew of, but never intended to offer, hooking up his client with missing parcels at this satellite unit. So the error interjected by this defendant in his own trial was huge. With regard to the points for obstruction of justice or perjury, actually what the defendant, Mr. Bogart, stated 6 to 10 months, actually it's 6 to 12 months that the defendant could have received. The defendant, or excuse me, Judge Sopata, if you took a look at the supplemental excerpt of record, page 152, the judge clearly states on there, this is a moot issue, because even if, you know, he'd received the two extra points, he's not going to get any different sentence, and if he comes back, I'm not going to sentence him any differently. I mean, the defendant, considering the fact that he blatantly perjured himself on the witness stand, received a hugely lenient sentence. He received only two months with four months of electronic monitoring. He's out of prison now, and so there's absolutely no prejudice for the perjury point. And again, this is a moot argument, since he was sentenced as if there were no perjury points awarded at all. Mr. Bogart mentions the 404B test, that this evidence, the rebuttal evidence, was too remote and dissimilar. That's not the test. This was rebuttal evidence, not 404B evidence. It was, there was a 403 analysis performed by Magistrate Velasco almost four months before trial, putting Mr. Bogart on notice that not just if his defendant testified, but if his defendant testified that they were unduly, unfairly picking on him. So he was not boxed in. The defendant could have testified truthfully, and as a matter of fact, he has no right to perjure himself if he testifies. So, and Magistrate Velasco was very clear. It wasn't just if the defendant testified. It was if he testified to this conspiracy theory. And during that hearing, he necessarily conducted a 403 analysis on this evidence by first precluding it as 404B evidence, but then determining that it would become more probative than prejudicial if the defendant tipped the scales and injected a conspiracy theory, which is exactly what this defendant did in this case. So I strongly disagree with Mr. Bogart that he had no choice. He had every choice to just let the government put on their case and necessarily meet their burden without putting his client on to perjure himself. As Mr. Bogart stated, the government was the first to bring up the setup. That's absolutely not correct. Mr. Bogart, as I said, mentioned it in his opening statement, and that was the theme through his cross-examination of Dent, through the defendant's testimony that he had suspicions that people were trying to set him up, and that was specifically because of the missing monies, the missing, excuse me, postal service monies. And then, of course, Mr. Urea continued that theme. And, of course, a final note as to the obstruction of justice points. There were no consequences. And as I've said, this defendant was treated extremely fairly, considering his deaths and his perjury during this trial. And that's all I have, Your Honors. Thank you. Thank you, counsel. Mr. Bogart, you used up your time, but we'll restore one minute for rebuttal if you'd like to use it. I have very little to say, but I do want to make note to the Court that the government has repeatedly stated that I said certain things in the opening statement. I would ask the Court to reflect that it is not in the record, it has not been designated, and I personally don't have any recollection of that. But I find some difficulty in trying to respond to something that is not in the As I stated earlier, I believe that the Court can determine whether or not the defendant opened the door by looking at the transcript, the trial transcript of April 902, pages 35, line 9, through page 38, line 12. And if the Court believes that is insufficient to open the door, then I would submit that the government literally opened the door when it asked each of its They were involved in a conspiracy and when asked each witness in its case in chief whether or not there was a setup, that the defendant did not bring that in, the government did. Thank you. Thank you, counsel. The case just argued is submitted.
judges: Graber, Wardlaw, Bybee